# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **LEIGH W. JONES,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:10cv00313 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant. | ) | UNITED STATES MAGISTRATE JUDGE |

*I.  Background and Standard of Review*

The plaintiff, Leigh W. Jones, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2010). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify

a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Jones protectively filed a prior DIB application on March 18, 2003, alleging disability as of September 1, 2000, based on diabetes, headaches, cardiac problems, hypertension, a sleep disorder, panic attacks, depression and obesity. (Record, ("R."), at 13, 79-80, 183.) The claim was denied initially and on reconsideration. (R. at 79.) By decision dated December 23, 2005, an ALJ denied Jones's claim, finding that she suffered from severe impairments, namely congenital heart defect, osteoarthritis of the joints, angiomyolipoma[1] of the left kidney, diabetes, obesity and history of headaches, but that she retained the ability to perform a significant range of light work.[2] (R. at 89.) The Appeals Council thereafter denied Jones's request for review. (R. at 13.) By order dated January 29, 2007, this court upheld the Commissioner's denial of DIB benefits. *See Jones v. Barnhart*, Civil Action No. 7:06cv00257 (W.D. Va. Jan. 29, 2007).[3] On April 7, 2006, Jones

---

[1] An angiomyolipoma is a benign tumor containing vascular, adipose and muscle elements. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 84. (27th ed. 1988).

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, she also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2010).

[3] I find that this prior decision is res judicata. Despite Jones's argument in her brief that this prior claim should be reopened, I find that this court lacks subject matter jurisdiction to review the current ALJ's refusal to reopen the prior claim. *See Califano v. Sanders*, 430 U.S. 99, 107-09 (1977) (holding that neither the Administrative Procedure Act, nor 42 U.S.C. § 405(g) confers subject matter jurisdiction on the federal courts to review the Commissioner's refusal to reopen a prior determination); *McGowen v. Harris*, 666 F.2d 60, 65 (4th Cir. 1981) (holding that under the *Sanders* principle, jurisdiction to review exists when, even though the Commissioner has purported to rest denial of reopening on principles of administrative res judicata, a review of the record reveals that the merits of the claim actually have been reconsidered). Such is not the case here. In her decision, the ALJ simply stated that she concurred "with the analysis of the

protectively filed her current DIB application, again alleging disability as of September 1, 2000, based on heart problems, depression, panic attacks, a sleep disorder, obesity, osteoarthritis, mitral regurgitation, angiomyolipoma on both kidneys, degenerative joint disease, anemia, diabetes, migraine headaches, generalized pain throughout her body and a depressed immune system. (R. at 178-80, 207, 212, 256.) This claim also was denied initially and upon reconsideration. (R. at 97-99, 102-03, 107-09.) Jones then requested a hearing before an administrative law judge, ("ALJ"). (R. at 110-11.) The ALJ held a hearing on March 19, 2008, at which Jones was represented by counsel. (R. at 22-75.)

By decision dated May 14, 2008, the ALJ denied Jones's claim. (R. at 13-21.) The ALJ found that Jones met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2006.[4] (R. at 15.) The ALJ also found that Jones had not engaged in substantial gainful activity since September 1, 2000, the alleged onset date. (R. at 15.) The ALJ found that the medical evidence established that, through the date last insured, Jones suffered from severe impairments, namely congenital heart defect/mild cardiomegaly/congestive heart failure, osteoarthritis of the joints and shoulder pain, angiomyolipoma of the left kidney, diabetes, obesity and history of headaches, but she found that Jones did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part

medical and other evidence and the weight given to medical opinions set forth in [the prior ALJ's] December 23, 2005 decision." (R. at 13.) She further stated that "[i]n the interest of brevity, such analysis is incorporated herein by this reference and is not restated." (R. at 13.) After evaluating the evidence relevant to Jones's current DIB claim, the ALJ stated that "[t]here is insufficient evidence to reopen and revise the December 23, 2005 decision. . . ." (R. at 18.) I find that the ALJ did not make a finding on the merits of Jones's prior DIB claim, but inquired into the facts only to the extent necessary to determine whether it should be reopened. That being the case, I find that this court lacks subject matter jurisdiction to review her decision not to reopen the prior claim.

[4] Thus, Jones must prove disability at some point between December 24, 2005, and March 31, 2006.

404, Subpart P, Appendix 1, through the date last insured. (R. at 16.) The ALJ also found that, through the date last insured, Jones had the residual functional capacity to perform a range of sedentary work.[5] (R. at 17.) Specifically, the ALJ found that Jones could lift and/or carry items weighing up to 10 pounds occasionally and less than 10 pounds frequently, stand/walk for two hours in an eight-hour workday, sit for six hours in an eight-hour workday, occasionally climb, balance, stoop, kneel, crouch and crawl, but could perform no overhead reaching with the left shoulder, she needed the ability to take brief stretch breaks in place up to three to four times daily, she needed to work in a temperature controlled environment, and she could not work around harsh fumes, pollutants, irritants or chemicals. (R. at 17.) Thus, the ALJ found that Jones was unable to perform her past relevant work as an assembly line worker/inspector. (R. at 19.) Based on Jones's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Jones could perform, including jobs as a cashier, an assembler and a packer. (R. at 20.) Thus, the ALJ found that Jones was not under a disability as defined under the Act through the date last insured and was not eligible for benefits. (R. at 21.) *See* 20 C.F.R. § 404.1520(g) (2010).

After the ALJ issued her decision, Jones pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 1-5.) Jones then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2010). This case is before

---

[5] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2010).

the court on Jones's motion for summary judgment filed January 28, 2011, and on the Commissioner's motion for summary judgment filed April 1, 2011.

## II. Facts & Analysis

Jones was born in 1960, (R. at 239), which, at the time of her date last insured, classified her as a "younger person" under 20 C.F.R. § 404.1563(c). She has a high school education and obtained licensing to become a certified nursing assistant, ("CNA").[6] (R. at 263.) Jones has past relevant work as an assembler and inspector. (R. at 213, 270.)

In rendering her decision, the ALJ reviewed records from Twin County Regional Hospital; Dr. Talluri Balaji, M.D.; Dr. Paul Liebrecht, M.D.; Dr. Ralph Capaldo, M.D.; Dr. Mohammed A. Athar, M.D.; Dr. Richard Surrusco, M.D., a state agency physician; Howard S. Leizer, Ph.D. a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Joseph I. Leizer, Ph.D., a state agency psychologist; Northern Hospital of Surry County; Galax Family Care Center; The Heart and Vascular Center; Dr. Linda Lastinger, M.D.; and Dr. Samuel B. Luague, M.D.

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2010); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a

---

[6] Jones is not currently licensed as a CNA, and she testified that she never actually worked as a CNA. (R. at 31-32.)

listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2010).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2010); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Jones argues that the ALJ erred by failing to accord appropriate weight to the opinions of her treating and consultative physicians. (Memorandum In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 3-8.) She also argues that the ALJ failed to properly evaluate her subjective complaints. (Plaintiff's Brief at 8-9.) Next, Jones argues that the ALJ erred by failing to find that she suffered from a severe mental impairment. (Plaintiff's Brief at 10-11.) Lastly, she argues that the ALJ failed to consider her combination of impairments and their combined effect on her ability to perform substantial gainful activity. (Plaintiff's Brief at 11-14.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if she sufficiently explains her rationale and if the record supports her findings.

The record shows that Jones has a congenital heart defect requiring surgical repair at the age of five. (R. at 456.) In June 2005, Dr. Ralph Capaldo, M.D., at The Heart And Vascular Center, ("HVC"), noted that Jones had a grade 4/6 pansystolic murmur.[7] (R. at 306.) He continued to treat Jones through February

---

[7] A pansystolic murmur is a cardiac murmur that extends through contraction. *See* Dorland's at 1062, 1657.

-7-

2006. Over this time period, he diagnosed maturity onset noninsulin dependent diabetes mellitus, under suboptimal control; hypertension, under borderline control; chronic insomnia; peripheral edema; chronic agitated depression; hyperlipidemia, and iron deficiency anemia. (R. at 299-307.) Dr. Capaldo advised weight loss, and he prescribed metformin, Lexapro, trazodone and Lasix. (R. at 299-307.) Jones reported less depression after her dosage of Lexapro was increased, and only very slight trace pitting edema of the legs was noted after Lasix was initiated. (R. at 303.)

Dr. Capaldo completed a Medical Source Statement Of Ability To Do Work-Related Activities (Physical), ("MSS"), on July 18, 2005, finding that Jones could lift and carry items weighing up to 10 pounds both occasionally and frequently and that she could stand, walk and/or sit a total of six hours in an eight-hour workday. (R. at 374-77.) He further found that Jones was limited in the use of all extremities, that she should avoid more than occasional climbing, balancing, kneeling, crouching, crawling and stooping and that she should limit her exposure to humidity, hazards and fumes. (R. at 375, 377.) Dr. Capaldo found that Jones could occasionally reach in all directions, including overhead, handle objects, finger objects and feel objects. (R. at 376.)

An echocardiogram dated February 3, 2006, showed well-preserved left ventricular, ("LV"), systolic function with an LV ejection fraction of 45 to 55 percent; pulmonic stenosis; and a small patent foramen ovale.[8] (R. at 302.) On

---

[8] A patent foramen ovale is an incomplete closure of the atrial septum that results in the creation of a flap or valve-like opening in the atrial septal wall. *See* CLEVELAND CLINIC, http://my.clevelandclinic.org/disorders/patent_foramen_ovale_pfo/hic_patent_foramen_ovale_pfo.aspx (last visited May 11, 2011).

April 6, 2006, six days following the expiration of Jones's date last insured, Dr. Capaldo completed another MSS finding that Jones could lift and carry items weighing up to 20 pounds both occasionally and frequently. (R. at 418-21.)  He found that she could stand and/or walk for a total of at least two hours in an eight-hour workday, but that her ability to sit was not affected by her impairment.  (R. at 418-19.)  Dr. Capaldo did not note any limitations on Jones's ability to push and/or pull with the extremities. (R. at 419.)  He further found that Jones could occasionally balance, kneel, crouch, crawl and stoop, but never climb.  (R. at 419.)  He opined that she could frequently reach, handle, finger and feel objects.  (R. at 420.)  Finally, Dr. Capaldo found that Jones was limited in her ability to work around temperature extremes, hazards and fumes, odors, chemicals and gases.  (R. at 421.)  He noted that these limitations were the result of Jones being overweight and having poor conditioning and medication-induced fatigue from hypertensive medications.  (R. at 419-21.)

On November 10, 2006, Jones denied any cardiopulmonary complaints.  (R. at 474.)  At that time, Dr. Behzad Taghizadeh, M.D., another physician at HVC, noted that, overall, Jones was doing "ok." (R. at 474.) She stated that she could perform both indoor and outdoor chores. (R. at 474.) Physical examination was unremarkable with the exception of a grade 4/6 heart murmur.  (R. at 474.)  Dr. Taghizadeh diagnosed adult congenital heart with pulmonic stenosis, calcified pulmonic valve with peak gradient of 56mm, patent small foramen ovale and decreased LV ejection fraction of 49 percent; hypertension; hyperlipidemia; noninsulin dependent diabetes mellitus; and iron deficiency anemia. (R. at 475.) He advised dieting and exercise, but imposed no restrictions on Jones's activities. (R. at 475.)

Another echocardiogram dated April 18, 2007, showed moderately depressed LV systolic function with LV ejection fraction of 40 to 45 percent with moderate diffuse hypokinesis;[9] no mitral regurgitation; trace tricuspid regurgitation; mild right atrial and ventricular enlargement; small atrial septal aneurysm; and no pericardial or pleural effusion. (R. at 472.) Medication to prevent endocarditis was recommended. (R. at 472.) By letter dated October 19, 2007, Dr. Capaldo noted that Jones suffered from chronic fatigue, weakness, lethargy and shortness of breath at rest and with exertion as a result of adult pulmonic stenosis and chronic iron deficiency anemia. (R. at 369.) He also noted severe hypertension, hyperlipidemia and mature onset diabetes mellitus and that Jones was further medically compromised due to chronic agitated depression and panic attacks. (R. at 369.) Dr. Capaldo opined that "[t]hese combined medical conditions strongly merit consideration for her obtaining medical disability at this time." (R. at 369.)

On January 2, 2008, Jones saw Dr. Taghizadeh and reported doing well, but with continued complaints of fatigue. (R. at 444-46.) She denied chest pain or shortness of breath. (R. at 444.) She was diagnosed with atrial septal defect per echocardiogram, and Dr. Taghizadeh ordered another echocardiogram and prescribed Coreg. (R. at 445.) Medication to prevent endocarditis was again recommended. (R. at 446.) Another echocardiogram dated January 4, 2008, yielded substantially similar findings with the following exceptions: flat septal motion suggestive of pulmonary hypertension; pulmonic stenosis with an estimated gradient of 48 to 52 mmHg; mild pulmonic regurgitation; interatrial septal bulges into the left atrium; and moderate left atrial enlargement. (R. at 452.) On January

---

[9] Hypokinesis is abnormally decreased mobility; abnormally decreased motor function or activity. *See* Dorland's at 805.

16, 2008, Jones again reported doing well, but complained of erratic heart rate at times.  (R. at 441.)  A grade 2/6 murmur was noted.  (R. at 442.)  Dr. Taghizadeh diagnosed pulmonic stenosis; interatrial septum bulging into the left; bradycardia; and ejection fraction of 40 to 45 percent.  (R. at 442.)  He planned for Jones to wear a 24-hour Holter monitor, the results of which, dated January 25, 2008, showed a sinus rhythm with first degree atrioventricular block and right bundle branch block; frequent premature ventricular contractions; and ventricular bigeminy.[10]  (R. at 449.)  On January 29, 2008, Jones again reported doing well, denying any exertional chest pain or paroxysmal nocturnal dyspnea[11] or orthopnea,[12] but reporting chronic exertional shortness of breath.  (R. at 438.)  Dr. Taghizadeh stated that Jones had been stable from a cardiopulmonary standpoint.  (R. at 438.)  He ordered a Cardiolite stress test, which was performed on January 30, 2008, and showed no evidence of myocardial ischemia, but frequent premature ventricular contractions during the recovery period.  (R. at 447-48.)  Ejection fraction was estimated at 42 percent.  (R. at 447.)  On February 26, 2008, Jones again denied paroxysmal nocturnal dyspnea and orthopnea, but reported generalized fatigue.  (R. at 435.)  A grade 2/6 systolic murmur was noted, and Dr. Taghizadeh increased Jones's dosage of Coreg.  (R. at 436-37.)

---

[10] Ventricular bigeminy refers to an arrhythmia consisting of the repeated sequence of one ventricular premature complex followed by one normal beat.  *See* THE FREE DICTIONARY, http://medical-dictionary.the freedictionary.com/ventricular+bigeminy (last visited May 11, 2011).

[11] Paroxysmal nocturnal dyspnea is a form of respiratory distress related to posture (especially reclining at night) and usually attributed to congestive heart failure with pulmonary edema.  *See* Dorland's at 520.

[12] Orthopnea refers to difficulty breathing except in an upright position.  *See* Dorland's at 1192.

In addition to Jones's cardiac condition, the record also shows that she suffers from osteoarthritis of the joints. Relevant to her prior DIB claim, Jones saw Dr. Athar on July 25, 2003, for a consultative examination, at which time she complained of generalized weakness and joint pain. (R. at 456-63.) She complained of pain in both knees, stating that she had undergone a prior surgical repair of torn cartilage in the left knee. (R. at 457.) She also reported a prior right carpal tunnel release, as well as left hip and right shoulder pain. (R. at 457-59.) Jones noted difficulty walking, negotiating stairs, bending and stretching. (R. at 457.) She stated that she took ibuprofen for her hip and shoulder pain. (R. at 459.) Physical examination was relatively unremarkable, showing no tenderness to palpation of the right knee, the shoulder joints or the metacarpophalangeal, proximal interphalangeal, ("PIP"), or distal interphalangeal, ("DIP"), joints of both hands. (R. at 460-61.) Jones had full range of motion of the right knee and the shoulder joints and 4/5 strength in both hands. (R. at 461.) Sensory examination was intact. (R. at 461.) Jones had slight tenderness to palpation of the left knee with a restricted range of motion to 80 degrees with flexion, but left leg strength was 4/5. (R. at 461.) X-rays of the left knee showed mild patellofemoral degenerative joint disease. (R. at 461.) Jones was in no acute distress and walked with a normal gait. (R. at 462.) However, she was unable to squat and rise or stand or walk on her heels or toes. (R. at 462.) She could raise her arms overhead and perform dexterous movements with the hands. (R. at 462.) Dr. Athar opined that, due to constant weakness and left knee pain, she would have difficulty working outside of the home, and he deemed her prognosis guarded. (R. at 463.)

An MRI of the left shoulder dated September 10, 2004, showed likely bursitis. (R. at 294, 381.) Jones saw Dr. Paul Liebrecht, M.D., an orthopedist, from

November 2004 through October 2005 for her left shoulder pain. (R. at 290-93.) Over this time, she was prescribed Lodine, Naprosyn and Relafen, and she performed home exercises. (R. at 290-93.) Jones did not wish to undergo surgery, and on January 11, 2005, Dr. Liebrecht opined that she was doing so well, surgery was not appropriate. (R. at 292.) On March 8, 2005, Jones reported very little discomfort in her left shoulder and stated that she was "happy" with how she was doing. (R. at 292.) On April 19, 2005, Jones had some increased pain after stopping the home exercises and quitting Relafen. (R. at 291.) Dr. Liebrecht reinitiated Relafen, and he advised continued home exercises. (R. at 291.) He noted that if the left shoulder continued to cause pain, she would be a candidate for a subacromial decompression. (R. at 291.) He stated that he also would consider a trigger point injection. (R. at 291.) By May 20, 2005, Jones continued to have a "little discomfort," but was rather happy with how she was doing. (R. at 291.) When Dr. Liebrecht and Jones discussed the possibility of surgery, she again stated that she did not wish to do so. (R. at 291.) She was continued on Relafen and advised to increase the frequency of her range of motion exercises. (R. at 291.) On June 17, 2005, Dr. Liebrecht stated that Jones's left shoulder continued to do well and that Relafen greatly helped her. (R. at 290.) She had good range of motion with only some reduced internal rotation. (R. at 290.) On August 26, 2005, Jones reported some mild pain in the left shoulder, but stated that it did not bother her very much. (R. at 290.) She had full range of motion and a mildly positive impingement sign. (R. at 290.) Dr. Liebrecht opined that Jones was on the threshold of needing either a subacromial decompression or bursectomy, but Jones again stated that it did not bother her that much. (R. at 290.) Thus, Dr. Liebrecht continued her on medication and strengthening exercises and advised her to avoid excessive activity to the shoulder. (R. at 290.) On October 21, 2005, Jones reported

feeling "essentially completely better," noting occasional soreness, but no pain with activity. (R. at 290.) The left shoulder had full range of motion, minimal tenderness in the anterior bursa, no tenderness over the acromioclavicular, ("AC"), joint and was neurovascularly intact. (R. at 290.) Jones was "happy" with how she was doing, and Dr. Liebrecht continued her on Relafen and released her from his care to be seen on an as-needed basis only. (R. at 290.)

Dr. Athar completed another consultative examination on July 10, 2006, a little more than three months following the expiration of Jones's date last insured. (R. at 316-23.) Her complaints were essentially the same as during her previous examination except for increased bilateral hip pain that radiated into the lower back and increased shoulder pain. (R. at 317.) However, Jones stated that Tylenol and heat helped her hip and lower back pain. (R. at 317.) She stated that Relafen had helped her shoulder in the past, but she was currently taking only Tylenol. (R. at 317.) She noted difficulty raising her left shoulder. (R. at 317.) Jones was in no acute distress and walked with a cautious and slow gait. (R. at 320.) She was tender to palpation over the lumbosacral spine and left shoulder, and she was slightly tender to palpation of the DIP joints of all the fingers. (R. at 321-22.) Jones had normal range of motion of the lumbosacral spine and hip joints. (R. at 321.) Range of motion of the left shoulder was restricted to 100 degrees abduction, 100 degrees forward elevation, 70 degrees internal elevation, 75 degrees external rotation and 30 degrees adduction. (R. at 322.) Straight leg raise testing was negative bilaterally, Jones had good strength in both legs, and she was able to make a tight fist with both hands, which had good strength. (R. at 321-22.) Cranial nerves were grossly intact, as was sensation. (R. at 322.) Jones could not squat and rise, nor could she stand or walk on her heels, but she could stand and walk on

her toes. (R. at 323.) Jones also had difficulty raising her left arm over her head. (R. at 323.) X-rays of the lumbosacral spine showed only lower lumbar facet and degenerative disease. (R. at 322, 325.) Dr. Athar again opined that due to Jones's constant joint pain and weakness, she would have difficulty working outside of the home, and he deemed her prognosis poor. (R. at 323.)

A bone density scan dated July 20, 2006, was normal. (R. at 380.) On November 10, 2006, Jones denied any musculoskeletal complaints. (R. at 474.) She was in no acute distress, and physical examination of the joints was described as "benign." (R. at 474.) On March 14, 2008, Dr. Linda Lastinger, M.D., completed an MSS, finding that Jones could lift and carry items weighing less than 10 pounds both frequently and occasionally, that she could stand and/or walk for less than two hours in an eight-hour workday, that she could sit for less than six hours in an eight-hour workday, that she was limited in her ability to push and/or pull with the upper extremities, that she could occasionally climb and balance, but never kneel, crouch, crawl or stoop and that she could occasionally reach, handle, finger and feel objects. (R. at 465-68.) Dr. Lastinger further opined that Jones was limited in her ability to work around temperature extremes, noise, dust, vibration, humidity/wetness, hazards and fumes, odors, chemicals or gases. (R. at 468.) Dr. Lastinger provided no explanation for these findings, and the record contains only one treatment note from her, dated November 5, 2007. (R. at 430.) At that time, Dr. Lastinger noted that Jones had lost nearly 40 pounds over the previous several months. (R. at 430.) Jones reported that her blood sugar levels ran around 150 in the mornings. (R. at 430.) It does not appear that Dr. Lastinger performed a thorough physical examination of Jones at that time, and she imposed no restrictions on Jones's activities.

The record further shows that Jones suffers from a left renal angiomyolipoma for which she saw Dr. Talluri Balaji, M.D., from 2002 to 2007 for annual monitoring. (R. at 285-89, 423-27, 481-85.) A June 6, 2007, ultrasound also showed a small cyst in the right kidney as well. (R. at 484.) Jones was consistently asymptomatic from these conditions, and no restrictions were placed on her as a result thereof.

The record also shows that Jones suffers from mature onset noninsulin dependent diabetes mellitus. On June 24, 2005, Dr. Capaldo noted that her diabetes was under suboptimal control, and he prescribed metformin and advised weight loss. (R. at 307.) On October 14, 2005, Dr. Capaldo increased Jones's dosages of Metformin and Glucotrol. (R. at 303.) At that time, she had lost 11 pounds, and he advised continued weight loss. (R. at 303.) On February 3, 2006, Dr. Capaldo noted that Jones abused sweets and carbohydrates in her diet. (R. at 300.) Jones testified that she took a fluid pill for diabetes-related edema of the hands and feet, which caused her to take frequent restroom breaks. (R. at 37.) However, Jones never raised this frequency concern with any medical source contained in the record. In fact, on July 25, 2003, and again on July 10, 2006, she specifically denied urinary frequency. (R. at 320, 459.) On November 10, 2006, Jones denied any genitourinary complaints. (R. at 474.) Jones also testified that she suffered from diabetic neuropathy in her legs and feet. (R. at 34.) However, none of the records before the court include any such complaints or findings. In fact, physical examinations showed that Jones's sensation was intact. (R. at 322, 461.)

On November 30, 2007, Jones saw Dr. Samuel B. Luague, M.D., an ophthalmologist, for her first eye examination, despite having diabetes for several

years.  (R. at 479.)  Dr. Luague noted beginning hemorrhages and microaneurysms in the retina, likely due to blood sugar swings.  (R. at 479.)  He opined that such retinopathy would likely quickly worsen.  (R. at 479.)  Dr. Luague also found the onset of presbyopia, which was expected in an individual of Jones's age, and reading eyeglasses were prescribed.  (R. at 479.)  Jones was scheduled to return in six months.

The evidence also shows that Jones suffers from migraine headaches. However, on July 25, 2003, she informed Dr. Athar that these headaches were relieved by Tylenol.  (R. at 458.)  She informed Dr. Athar during her July 2006 examination that she had migraine headaches "pretty often," but she stated that Excedrin Migraine medication, as well as lying down in a dark room, helped.  (R. at 319.)  At her hearing, Jones testified that she had "one good bad headache a week," and they had required her to leave work at least once monthly. (R. at 48-49.)  She testified that her headaches were aggravated by strong smells, heat, loud noises and humidity.  (R. at 48.)

There also are two Physical Residual Functional Capacity Assessments completed by state agency physicians contained in the record. The first assessment was completed by Dr. Richard Surrusco, M.D., on July 13, 2006, more than three months following the expiration of Jones's date last insured. (R. at 326-32.) Dr. Surrusco found that Jones could lift and carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently. (R. at 326-32.)  He found that Jones could stand and/or walk for a total of at least two hours in an eight-hour workday and that she could sit for about six hours in an eight-hour workday. (R. at 327.) Dr. Surrusco found that Jones was limited in her ability to push and/or pull with

the upper extremities and that she could occasionally climb, balance, stoop and kneel, but never crouch or crawl. (R. at 327-28.) He opined that Jones was limited in her ability to reach overhead, that she should avoid concentrated exposure to temperature extremes and fumes, odors, dusts, gases and poor ventilation, but that she should avoid all exposure to hazards. (R. at 328-29.) Dr. Surrusco noted that Jones's significantly limited daily activities were consistent with the limitations indicated by the evidence, and he found her statements to be fully credible, noting that, despite treatment, Jones continued to have pain which greatly impacted her ability to perform work-related activities. (R. at 332.)

Dr. Robert McGuffin, M.D., another state agency physician, completed a Physical Residual Functional Capacity Assessment on November 14, 2006, nearly eight months after the expiration of the date last insured, making findings identical to those included in Dr. Surrusco's July 2006 assessment. (R. at 347-53.)

Jones first argues that the ALJ erred by failing to accord adequate weight to the opinions of her treating physicians, Dr. Capaldo and Dr. Lastinger, as well as those of Dr. Athar, the consultative examiner. (Plaintiff's Brief at 3-8.) I disagree. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d 866, 869 (4th Cir. 1983). The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(d) (2010). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996

(quoting *Hunter v. Sullivan* 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Jones contends that the ALJ improperly disregarded Dr. Athar's July 2006 observations that Jones had shortness of breath on slight exertion, restricted range of motion of the left shoulder and tenderness on palpation of the DIP joints of all fingers. (R. at 322-23.) Dr. Athar opined in 2006, just as he did in 2003, that due to constant weakness and joint pain, Jones would have difficulty working outside the home. (R. at 323.) While the ALJ did not address every finding contained in Dr. Athar's assessment in her decision, I do not find persuasive Jones's contention that the ALJ totally disregarded Dr. Athar's findings specified above. I find that the ALJ's residual functional capacity determination accounts for all of these impairments. Specifically, the ALJ found that Jones was restricted to standing and/or walking to a total of two hours in an eight-hour workday, that she could not perform overhead reaching with the left shoulder, that she needed to work in a temperature controlled environment and that she should avoid exposure to harsh fumes, pollutants, irritants or chemicals. (R. at 17.) Additionally, I note that Dr. Athar's opinion that Jones could not work outside the home is an opinion on an issue reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e) (2010).

Jones also contends that the ALJ erred by rejecting the portion of Dr. Capaldo's July 2005 assessment finding that she had manipulative limitations. The ALJ stated that she was giving significant weight to both Dr. Capaldo's July 2005 and April 2006 MSS. (R. at 19.) She noted that both of these assessments indicated

that Jones had the capacity to lift and/or carry weight and stand/walk and sit for long enough periods of time to perform ranges of light and sedentary work. (R. at 19.) However, the ALJ noted that she was rejecting Dr. Capaldo's July 2005 opinion that Jones had manipulative limitations because the objective evidence did not support such a finding. It is true that in July 2005, Dr. Capaldo found that Jones could occasionally reach, handle, finger and feel objects. (R. at 376.) However, in the April 6, 2006, assessment, Dr. Capaldo opined that Jones could perform these activities "frequently." (R. at 420.) Thus, Dr. Capaldo found an improvement in this area from July 18, 2005, to April 6, 2006, just six days after Jones's date last insured. Moreover, the treatment notes of record do not support a finding of such manipulative limitations, with the exception of reaching with the left shoulder, as discussed above. In particular, on July 25, 2003, Jones had 4/5 strength in both hands, and sensory examination was intact. (R. at 461.) Dr. Athar explicitly noted that Jones could perform dexterous movements with both hands. (R. at 462.) On July 10, 2006, despite having slight tenderness of the DIP joints in all fingers, Jones was able to make a tight fist with both hands and had good strength therein. (R. at 322.) Sensation again was intact. (R. at 322.) In July 2006 and November 2006, Dr. Surrusco and Dr. McGuffin, respectively, found that Jones was not limited in her ability to handle, to finger or to feel objects. (R. at 328, 349.) It is true that Dr. Lastinger found in March 2008 that Jones was limited to occasionally handling, fingering and feeling objects, but Dr. Lastinger provides no explanation for this finding, and the only treatment note from her contained in the record is dated November 2007 and evidences no examination of Jones at that time and no findings regarding her ability to perform manipulative tasks. (R. at 430.) Dr. Lastinger imposed no restrictions on Jones's activities in November 2007. (R. at 430.)

For all of the above-stated reasons, I find that substantial evidence supports the ALJ's weighing of the medical evidence. Next, Jones argues that the ALJ erred by failing to properly evaluate her subjective complaints. (Plaintiff's Brief at 8-9.) The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain or other subjective symptoms. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig*, 76 F.3d at 594. Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers. . . .

*Craig*, 76 F.3d at 595. "[P]ain itself can be disabling, and it is incumbent upon the ALJ to evaluate the effect of pain on a claimant's ability to function." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989). However, "[s]ubjective evidence of pain cannot take precedence over objective medical evidence or the lack thereof." *Parris v. Heckler*, 733 F.2d 324, 327 (4th Cir. 1984). Evidence of a claimant's activities as affected by pain is relevant to the severity of the impairment. *See Craig*, 76 F.3d at 595.

Furthermore, as in the case of other factual questions, credibility determinations as to a claimant's testimony regarding her pain or other symptoms are for the ALJ to make. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984); *see also Hays*, 907 F.2d at 1456; *Taylor,* 528 F.2d at 1156. An ALJ's assessment of a claimant's credibility regarding the severity of pain or other subjective symptoms is entitled to great weight when it is supported by the record. *See Shively*, 739 F.2d at 989-90 Furthermore, "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively*, 739 F.2d at 989. Ordinarily, this court will not disturb the ALJ's credibility findings unless "it appears that [her] credibility determinations are based on improper or irrational criteria." *Breeden v. Weinberger*, 493 F.2d 1002, 1010 (4th Cir. 1974).

I find that substantial evidence supports the ALJ's analysis of Jones's pain and other subjective allegations. The ALJ stated as follows in her decision: "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record." (R. at 17.) The ALJ stated that Jones's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the residual functional capacity assessment, the reasons for which were thereafter explained. In particular, the ALJ noted the mild findings with regard to Jones's cardiac impairment, including physical examinations showing Jones to be in no acute distress, echocardiogram findings, her own statements that she was doing

"ok" and doing "well," statements that she was able to perform both indoor and outdoor chores and the denial of exertional chest pain. (R. at 18.) With regard to the angiomyolipoma, the ALJ noted that clinical testing showed that the condition was stable. (R. at 18.) As for Jones's migraine headaches, the ALJ noted that Jones had indicated that over-the-counter Excedrin Migraine medication helped control her symptoms. (R. at 18.) It is well-settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Regarding Jones's shoulder pain, the ALJ noted the September 10, 2004, MRI finding of bursitis, her statements that medications helped with her shoulder pain and her statements that her shoulder was essentially completely better and did not hurt with activity. (R. at 18.) It is true that both state agency physicians found Jones's statements fully credible. (R. at 332, 353.) However, as noted earlier, credibility determinations are for the ALJ to make, and this court will not disturb them unless it appears they are based on "improper or irrational criteria." *Breeden*, 493 F.2d at 1010; *Shively*, 739 F.2d at 989-90. For the reasons just stated, I cannot find that the ALJ's credibility determination was based on improper or irrational criteria, and, therefore, I find that the ALJ's credibility finding and resulting analysis of Jones's pain and other subjective symptoms is supported by substantial evidence.

Jones next argues that the ALJ erred by failing to find that she suffered from a severe mental impairment. (Plaintiff's Brief at 10-11.) I find this argument unpersuasive. In support of her argument, Jones emphasizes notations in the record that she has a history of panic attacks, situational depression, domestic stress and agitated depression. However, the mere existence of an impairment is not sufficient to find disability based thereon. Instead, the resulting functional

limitations must be assessed to determine whether the impairment is of a disabling nature. There are two Psychiatric Review Technique forms, ("PRTF"), completed by state agency psychologists, contained in the record. First, Howard S. Leizer, Ph.D., completed one on July 26, 2006, finding that Jones suffered from a nonsevere anxiety-related disorder and affective disorder. (R. at 333-46.) He found that Jones was only mildly restricted in her activities of daily living, experienced mild difficulties in maintaining social functioning, and in maintaining concentration, persistence or pace and that she had suffered no repeated episodes of decompensation. (R. at 343.) Leizer found Jones's allegations partially credible. (R. at 346.) The second PRTF was completed by Joseph I. Leizer, Ph.D., on November 14, 2006, and contained the same findings as those rendered by Howard Leizer. (R. at 354-67.)

As the Commissioner states in his brief, Jones received treatment for her alleged mental impairments from her treating physician only in the form of medication. She has received no mental health counseling, nor has she received inpatient mental health treatment, as her treating physician apparently did not see fit to refer her for any type of specialized psychological evaluation or treatment. The evidence shows that Jones complained only of situational stressors, including her daughter's pregnancy and the deaths of her parents. (R. at 300, 303, 306, 458.) Jones was consistently described as being in no acute distress. (R. at 300, 303, 305-06, 320.) None of the treating or examining sources noted that Jones had any difficulty relating to them. Jones's activities of daily living further undermine her allegations of a severe mental impairment. For instance, in a Function Report dated May 14, 2006, Jones reported that she got her 16-year-old daughter up for school, performed light housework, prepared light meals and watched television. (R. at

223-30.) She indicated that she was able to drive, that she could go out alone and that she went grocery shopping with her husband every two weeks. (R. at 226.) Jones stated that she could pay bills, count change, handle a savings account and use a checkbook/money orders. (R. at 226.) She further stated that she read magazines, visited family, attended church services and went tanning with her daughter. (R. at 227.) She reported difficulty concentrating, but indicated that she did not know how long she could pay attention. (R. at 228.) However, Jones reported that she was able to complete tasks, could follow both written and spoken instructions "o.k." and could get along with authority figures "o.k." (R. at 228-29.) Jones stated that she did not handle stress or changes in routine well. (R. at 229.) There also is evidence in the record that Jones took a tour bus to Ohio in 2003, and she went on a week's vacation to Myrtle Beach, South Carolina, in July 2005. (R. at 305.) Further undermining Jones's argument is the evidence showing that medication controlled her symptoms related to any such mental impairments. For instance, in October 2005, after Dr. Capaldo increased Jones's dosage of Lexapro, she indicated that she was less depressed. (R. at 303, 307.) *See Gross*, 785 F.2d at 1166 (holding that a symptom is not disabling if it can be controlled by medication or treatment.)

I further find Jones's argument that the ALJ should have ordered a consultative psychological evaluation unpersuasive. Generally, 20 C.F.R. § 404.1519a allows for a consultative examination when the evidence as a whole is insufficient to support a decision on a claim. However, for the reasons just stated, I find that the evidence before the ALJ was more than sufficient to support her decision that Jones did not suffer from a severe mental impairment.

Lastly, Jones argues that the ALJ erred by failing to consider the combination of her impairments and their effect on her ability to perform substantial gainful activity. (Plaintiff's Brief at 11-14.) I disagree. The ALJ found that, although Jones suffered from numerous ailments, she did not have an impairment or combination of impairments listed in, or medically equal to a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16.) It "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity. … [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50 (citing *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir. 1985); *DeLoatche v. Heckler*, 715 F.2d 148 (4th Cir. 1983); *Oppenheim v. Finch*, 495 F.2d 396 (4th Cir. 1974); *Hicks v. Gardner*, 393 F.2d 299 (4th Cir. 1968); *Griggs v. Schweiker*, 545 F. Supp. 475 (S.D. W.Va. 1982)). However, an ALJ need not explicitly state that he or she has considered a claimant's impairments in combination. What matters is whether it is discernible from the ALJ's decision that he or she did so. I find that such is the case here. It is apparent that the ALJ's residual functional capacity finding accounts for all of Jones's limitations that are supported by the record. More specifically, the ALJ took into account Jones's cardiac impairment by restricting her to lifting and/or carrying items weighing up to 10 pounds occasionally and less than 10 pounds frequently and by restricting her to standing/walking only two hours in an eight-hour workday. Likewise, the ALJ accounted for Jones's osteoarthritis by limiting her ability to lift and/or carry, to stand/walk, to climb, balance, stoop, kneel, crouch and crawl, by limiting her from reaching overhead with the left shoulder and by allowing for brief stretch breaks in place up to three to four times daily. The ALJ

accounted for Jones's migraine headaches by requiring work in a temperature controlled environment and restricting her from working around harsh fumes, pollutants, irritants or chemicals. As for Jones's other severe impairments, namely angiomyolipoma of the left kidney, diabetes and obesity, the record does not support a finding of any limitations as a result thereof. Additionally, for the reasons stated herein, the record also does not support a finding that Jones suffered from a severe mental impairment at any time on or prior to her date last insured.

It is for all of these reasons that I find that the ALJ properly considered Jones's impairments in combination in concluding that she was not disabled on or before her date last insured.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the ALJ's weighing of the medical evidence;

2. Substantial evidence exists to support the ALJ's evaluation of Jones's subjective complaints;

3. Substantial evidence exists to support the ALJ's finding that Jones did not suffer from a severe mental impairment through her date last insured;

4. The ALJ properly considered the combined effect of Jones's impairments on her ability to perform substantial gainful activity; and

5. Substantial evidence exists to support the ALJ's finding that Jones was not disabled under the Act and not eligible for DIB benefits through her date last insured.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Jones's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the ALJ's decision denying DIB benefits. I further recommend that the court deny Jones's request to present oral argument based on my finding that it is not necessary, in that the parties have more than adequately addressed the relevant issues in their written arguments.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2010):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of

the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Samuel G. Wilson, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     May 17, 2011.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE